## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| ANTONIO VELIKOV, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| vs. | ) | **Case No. 2:13-CV-8044-SLB** |
| | ) | **Crim. Case No. 2:12-CR-0041-SLB-JEO** |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |

### MEMORANDUM OPINION

This case is presently pending before the court on petitioner's Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody [Motion to Vacate]. (Doc. 1; Crim. Doc. 49.)[1] Petitioner, Antonio Velikov, has filed a Motion to Vacate, pursuant to 28 U.S.C. § 2255, asking the court for relief from his custodial sentence and restitution order. (Doc. 1.) The court has construed the Motion to Vacate as asserting the following grounds for relief:

> 1. Counsel was ineffective for agreeing to the appeal/habeas waiver provision in the plea agreement.

> 2. Counsel was ineffective by "mis-representing . . . that the petitioner was competent to read, speak, or understand the English language."

---

[1]Citations to documents in the court's record in petitioner's Motion to Vacate appear as "(Doc. __)." Citations to documents in the court's record in the criminal proceedings against petitioner, Case No. 5:11-CR-00102-SLB-JEO, appear as "(Crim. Doc. __)." Page number citations refer to the page numbers assigned to the document by the court's CM/ECF electronic filing system.

3.  Counsel was ineffective for "[f]ailing to object at sentencing to the total amount of 'Loss' to the victims, as it was impossible to be $862,478.62."

4.  Counsel was ineffective for "[f]ailing . . . to object to the number of victims alleged."

5.  Counsel was ineffective "[a]t sentencing for failing to object to the Court's finding of the intended loss and potential loss were identical (i.e., over one million)."

6.  Counsel was ineffective "[a]t sentencing for failing to object to the court's only applying one means of determining petitioner's amount of restitution."

7.  Counsel was ineffective "[a]t sentencing for failing to object to the amount of restitution without the court's consideration of the petitioner's ability to pay the restitution."

8.  Counsel was ineffective "[a]t sentencing for failing to object to the court's imposition of restitution in addition to the one hundred twenty-one (121) months of imprisonment."

9.  Counsel was ineffective "[a]t sentencing for failing to object to the court's imposition of two punishments for the same conduct – double jeopardy."

(*See* doc. 2 at 2.)  For the reasons stated below, Velikov's Motion to Vacate is due to be denied.

## I.  **BACKGROUND**

Velikov is a citizen of Bulgaria and was in this country illegally at the time of his arrest.  (Crim. Doc. 36 at 3, 13; Crim. Doc. 46 at 3; )  English is not his native language.  (Doc. 9 at 1.)  However, he first entered the United States in 1995 and has "some fluency in English."  (Crim. Doc. 36 at 13-14.)

On July 14, 2011, the Government filed a Criminal Complaint against Velikov and his co-defendant, Mariana Biserova Pashova, charging them with access-device fraud. (Crim. Doc. 1 at 1.) On February 1, 2012, the Grand Jury returned a five-count Indictment charging Velikov and Pashova as follows: Count One – conspiracy to commit bank fraud in violation of 18 U.S.C. §§ 1349 and 1344; Count Two – aiding and abetting bank fraud in violation of 18 U.S.C. §§ 2 and 1344; Count Three – aiding and abetting access device fraud in violation of 18 U.S.C. §§ 2 and 1029(a)(4); Count Four – aiding and abetting possession of counterfeit access devices in violation of 18 U.S.C. §§ 2 and 1029(a)(3); and Count Five – aiding and abetting aggravated identity theft in violation of 18 U.S.C. §§ 2 and 1028A. (Crim. Doc. 2 at 1-7.) The Indictment also contained a Notice of Forfeiture. (*Id*. at 7-8.)

Shortly after the Indictment was filed, Magistrate Judge T. Michael Putnam arraigned Velikov and Pashova on these charges. At his arraignment and, throughout the criminal proceedings, Velikov was represented by Scott Boudreaux; Velikov had retained Boudreaux several months before his arraignment. (Doc. 5-16 at 1.) Boudreaux was aware that Velikov was a native Bulgarian and that English was not Velikov's first language. (*Id*.) Nevertheless, he testified that he had no difficulty communicating with Velikov. (*Id*.) At the arraignment, an interpreter was available by telephone. However, Velikov told the court that such an interpreter was not necessary:

> THE COURT: This is in the Matter of United States of America v. Antonio Velikov, and that is case number 2:12-CR-41-SLB.
>
> Are you Antonio Velikov?

3

THE DEFENDANT:  Yes, sir.

THE COURT:  Mr. Velikov, we have available to you an interpreter to translate proceedings this morning.  If you need the assistance of the interpreter, certainly she is available.  Mr. Boudreaux has indicated that you do not believe that you need the assistance of the interpreter, but certainly that's up to you.

*Do you think that you need the assistance of the interpreter?*

THE DEFENDANT:  *No.*

THE COURT:  *You do not?*

THE DEFENDANT:  *No.*

THE COURT:  Then I want to thank and I will excuse the interpreter.  Thank you very much for being available.  We'll proceed then without the interpreter.  Thank you very much for being available to us.

(Crim. Doc. 51 at 2-3 [emphasis added].)  The arraignment then proceeded and nothing in the record of the arraignment indicates that Velikov was unable to fully comprehend the proceedings due to his alleged inability to understand and communicate in English.

As part of plea negotiations, the Government offered to attempt the coordination of a plea agreement that would bind a total of 10 federal districts with respect to the defendants' bank fraud conspiracy.  Velikov and his co-defendant faced exposure to criminal charges in multiple federal districts.  According to Boudreaux, "During plea negotiations, which were complex due to the nature of the case, [Velikov] asked appropriate questions after reviewing the attendant documents."  (Doc. 5-16 at 1.)  Following these negotiations, the Government and Velikov reached an agreement.  (*See generally* Crim. Doc. 24.)

In this Plea Agreement, Velikov agreed to plead guilty to Counts Two, Four, and Five of the Indictment and he agreed to "pay restitution of at least $862,478.62 to Bank of America (jointly and severally with any convicted codefendants)."[2]  (*Id*. at 1.)  In exchange, the Government agreed to dismiss Counts One and Three and to make a sentencing recommendation.  (*Id*.)  Also, Velikov stipulated that the facts set forth in the Plea Agreement were "substantially correct" and could be used by the court in calculating his sentence.  (*Id*. at 10; *see id*. at 4-10.)  Among the facts to which Velikov stipulated were as follows:

> 1.  "Based on the offenses of conviction and the stipulated offenses that occurred in the other nine districts, VELIKOV's offenses 'involved 250 or more victims,' as that phrase is used in U.S.S.G. § 2B1.1(b)(2)."  (Crim. Doc. 24 at 10.)

> 2.  "The fraud in the other nine districts resulted in an ***actual loss*** to Bank of America of at least $862,478.62.  The parties do not have an agreement regarding the ***intended loss*** to Bank of America.  (See U.S.S.G. § 2B1.1, comment. (n.3).)"  (Crim. Doc. 24 at 9 [emphasis added].)

> 3.  At the time of his arrest, Government agents recovered approximate 340 re-encoded/counterfeit debit/credit cards of which 294 "were encoded with the valid account numbers for Bank of America debit/credit cards. . . . Of those 294 accounts, 129 had suffered actual fraud loss totaling $74,316.50."  (*Id*. at 5.)

> 4.  "In addition to Bank of America, at least one other financial institution absorbed losses at the hands of VELIKOV and his co-schemers. During the administrative forfeiture process concerning the property and money seized from Rooms 319 and 320 of the Holiday Inn, a credit union outside the state

---

[2]Velikov also consented to a forfeiture order.  (Crim. Doc. 24 at 1.)

of Alabama lodged a successful claim of nearly $50,000 against the currency. (*Id*. at 8.)

As part of the Velikov's Plea Agreement, he indicated he understood and agreed that the relevant conduct contained in the factual basis of his Plea Agreement would be used by this court to determine the advisory guidelines range.  (*Id*. at 18.)  The Plea Agreement contained a "Waiver of Right to Appeal and Post-Conviction Relief," which provided:

> In consideration of the recommended disposition of this case, I, ANTONIO VELIKOV, hereby waive and give up my right to appeal my conviction and/or sentence in this case, as well as any fines, restitution, and forfeiture orders, the Court might impose.  Further, I waive and give up the right to challenge my conviction and/or sentence, any fines, restitution, forfeiture orders imposed or the manner in which my conviction and/or sentence, any fines, restitution, and forfeiture orders were determined in any post-conviction proceeding, including, but not limited to, a motion brought under 28 U.S.C. § 2255.

> The defendant reserves the right to contest in an appeal or post-conviction proceeding any of the following:

> (a)  Any sentence imposed in excess of the applicable statutory maximum sentence(s);

> (b)  Any sentence imposed in excess of the guideline sentencing range determined by the Court at the time sentence is imposed; and

> (c)  Claims of ineffective assistance of counsel.

The defendant acknowledges that, before giving up these rights, the defendant discussed the Federal Sentencing Guidelines and their application to the defendant's case with the defendant's attorney, who explained them to the defendant's satisfaction.  The defendant further acknowledges and understands that the Government retains its right to appeal where authorized by statute.

(*Id*. at 13-14.)  Velikov signed below this provision, indicating  that he "fully [understood] the foregoing paragraphs" and that he "knowingly and voluntarily enter[ed] into this waiver." (*Id*. at 14.)

On June 25, 2012, this court held a change of plea hearing with Velikov and his co-defendant, Pashova.  As that hearing began, the following occurred:

> THE COURT:  We're here this afternoon in the case of United States of America versus Antonio Velikov and Mariana Biserova Pashova, CR-12-41-S.  Are the defendants fluent in English?  I don't know what their nationality is.  Are they Americans, or what is their nationality[?]
>
> MR. THREATT [Pashova's counsel]:  My client is a United States citizen[], Your Honor.  She's completely fluent and literate in English.
>
> THE COURT:  I'm sorry, fluent in English?
>
> MR. THREATT:  Fluent and literate in English.
>
> THE COURT:  Mr. Boudreaux?
>
> MR. BOUDREAUX:  My client is not a United States citizen.  He is from Bulgaria.  But, in my opinion, he is fluent in English and is able to read[,] write[,] and understand the English language.

(Crim. Doc. 46 at 3.)

During the plea colloquy, the court communicated with Velikov in English.  Velikov responded appropriately to the court's questions and at no time did he demonstrate that he was unable to fully comprehend the proceedings.  During this hearing, the  following occurred:

> THE COURT: Mr. Velikov, . . . if anything is said here today that you do not fully understand, I want you to interrupt the proceedings and either ask

me to clear it up for you or allow you an opportunity to speak in private with your lawyer.

Do you understand, Mr. Velikov?

DEFENDANT VELIKOV:  Yes, ma'am.

. . .

THE COURT:  It's not uncommon for pleas of guilty to be offered in reliance on a plea bargain or plea agreement between the defendant, the defendant's attorney and the U.S. Attorney's Office.

Plea bargains or plea agreements are permissible, but they are not binding on the court.  In other words, it is the judge who makes the final decision as to an appropriate sentence.  But when a defendant is entering a plea of guilty in reliance on a plea bargain or plea agreement, then the court needs to know the terms of that agreement.

So, at this time, I'm going to ask the Assistant U.S. Attorney to state for the record the pertinent terms of the plea agreement[s] that have been filed in your respective cases.  . . .

. . .

MS. ATWOOD:  May it please the court, the defendants each have agreed to plead guilty to Counts Two, Four and Five of the indictment in this case, to pay restitution of at least $862,478.62 to the Bank of America jointly and severally with one another and to consent to an order of forfeiture in the amount of $74,316.50.

They also have agreed . . . to waive certain rights to direct appeal or later collateral attack of the conviction or sentence later imposed in this case.

. . .

MS. ATWOOD:  And, in exchange for this, the government has agreed to dismiss Counts One and Three of the indictment at the time of sentencing. The plea agreement is a little unusual, Your Honor, in that . . . it binds nine

federal districts in addition to this one.  So I don't know if you wanted me to mention those districts at this time.

THE COURT:  That would be good.  I did read it, but why don't you read it into the record.  It binds them as to this instant conduct but not as to tax liability is my understanding?

MS. ATWOOD:  Correct, Your Honor.  And the districts are the Eastern, Middle and Western Districts of North Carolina, the Middle and Southern Districts of Florida, the Eastern District of Virginia, the Eastern and Middle Districts of Tennessee and the District of South Carolina.

Your Honor, our recommendation at the time of sentencing is outlined on Pages 11 through the top of Page 13 of the plea agreements.  The government will recommend that each of the defendants be awarded an appropriate reduction in offense level for acceptance of responsibility, that the defendants be sentenced to a term of imprisonment that is within the Guideline range, the low end of the range . . . and then we will recommend obviously the restitution be made and that the defendants pay their assessment fee and the other general terms that we recommend at the time of sentencing.

. . .

THE COURT:  All right.  Mr. Boudreaux, on behalf of your client, is there anything you need to add to the statements of the Assistant U.S. Attorney concerning the pertinent terms of the plea agreement?

MR. BOUDREAUX:  No, ma'am.

. . .

THE COURT:  Mr. Velikov and Ms. Pashova, you've each heard the Assistant U.S. Attorney outline the pertinent terms of your respective plea agreements.  Do any of you have anything you need add to her statements so that I know everything you are relying upon in entering a plea of guilty?  Mr. Velikov, do you have anything you need to add?

DEFENDANT VELIKOV:  No, ma'am.

. . .

THE COURT:  The plea agreements also contain a section entitled "Waiver of Right to Appeal and Post-Conviction Relief."   In this section of the plea agreement, you are each giving up some important constitutional rights.

Specifically, you're giving up the right to appeal your convictions and sentences either by way of a direct appeal or by way of what's called a habeas corpus petition pursuant to [28 U.S.C. § 2255] subject to only three limitations:

One, if I imposed a sentence above the applicable statutory maximum sentence; two, if I imposed a sentence above the Sentencing Guideline range; or, three, if you have any kind of claim for ineffective assistance of counsel.

But do you understand, with those three exceptions, you're waiving your right to appeal your conviction and sentence either by way of a direct appeal or by way of what's called a habeas corpus petition?  Do you understand, Mr. Velikov?

DEFENDANT VELIKOV: Yes, ma'am.

. . .

THE COURT: And as the Assistant U.S. Attorney pointed out, you all have agreed that the court can take into consideration in sentencing conduct that occurred in other jurisdictions, including amounts due in restitution and relevant conduct for purposes of determining the Guidelines.

Do you understand essentially you are pleading guilty in this district, but conduct and criminal acts you committed in other districts are going to be taken into consideration by the court and the probation office in determining what the appropriate sentence should be?

Do you understand that, Mr. Velikov?

DEFENDANT VELIKOV:  Yes, ma'am.

. . .

THE COURT: Other than the plea agreement that we have just discussed in your respective cases, has anyone promised you anything or

threatened you in any way in order to induce you to enter a plea of guilty, Mr. Velikov?

DEFENDANT VELIKOV:  Yes, ma'am.

THE COURT:  You have been threatened?

DEFENDANT VELIKOV:  No.

THE COURT:  Let me say it again:  Other than what we've just discussed, has anyone promised you anything or threatened you in any way in order to induce you to enter a plea of guilty?

DEFENDANT VELIKOV: No, ma'am.

. . .

THE COURT:  Is there anything that prevents either of you from understanding anything I am saying to you here today, Mr. Velikov?

DEFENDANT VELIKOV:  No, ma'am.

. . .

THE COURT:  I'm going to ask the defendants, Mr. Velikov, Ms. Pashova, each of you to listen carefully to what the Assistant U.S. Attorney is going to say.  She is now going to outline for you and for me briefly certain of the facts she would expect the government to prove should this case proceed to trial.

If, while she is speaking, she says anything that is not true or that you do not believe the government can prove, I want to you interrupt her and let me know.

Do you understand, Mr. Velikov?

DEFENDANT VELIKOV: Yes, ma'am.

. . .

11

THE COURT: All right. Ms. Atwood.

MS. ATWOOD:  Your Honor, at all relevant times, Regions Bank and the Bank of America were each insured by the Federal Deposit Insurance Corporation.  In the early morning hours of May 20th, 2011, police in Hoover, Alabama, arrested Ms. Pashova and Mr. Velikov for attempting to place a skimmer . . .

. . .

MS. ATWOOD:  The police arrested both defendants for attempting to place a skimmer, which is a credit or debit card reader and information storage device, on an ATM [at] a Regions Bank.  The Hoover Police Department recovered the skimmer, and they contacted the U.S. Secret Service.

After learning that the pair had rented rooms 319 and 320 at the Holiday Inn Birmingham Airport, agents obtained a federal search warrant for those rooms.  During the execution of that search warrant, agents seized over $50,000 in U.S. currency, which was mostly in denominations of $20 U.S. Federal Reserve notes bound in $1,000 increments.  The $1,000 bundles were held together by rubber bands and were inside of plastic bags.  Some of the plastic bags were wrapped in what appeared to be blue painters tape.

Agents also found four laptop computers, a magnetic stripe encoder that could be used to write stolen debit or credit card information on to new counterfeit debit or credit cards, a camouflaged skimmer identical in appearance to the one seized by the Hoover police at the time that the police arrested Ms. Pashova and Mr. Velikov and electronics and computer accessories that are tools of the trade for individuals who illegally harvest debit and credit card data through skimming devices and then use that information to create counterfeit access device cards.

And, Your Honor, the parties stipulate that this – as a term of plea agreement [–] stipulate that these items taken together meet the definition of device-making equipment as that term is used in [18 U.S.C. 1029(e)(6)] and the corresponding section of the Sentencing Guidelines.

Your Honor, the government would further prove that in one of the two hotel rooms agents found approximately 150 re-encoded counterfeit debit and credit cards.  In the second room[ ], agents found approximately 190 such

counterfeit cards.  Among the approximately 340 counterfeit cards recovered were 294 that were encoded with valid account numbers for Bank of America debit/credit card numbers.

Later investigation revealed that the aggregate account balance for those 294 accounts at the time of the fraud was $1,383,246.82.  Of those 294 accounts, 129 had suffered actual fraud loss, and that amount totaled $74,316.50.

. . .

Although Ms. Pashova and Mr. Velikov were arrested in the act of attempting to install a skimmer at a Regions Bank, that bank and its account holders apparently suffered no loss.  This seems to be because the Hoover Police Department officers apprehended the pair in the earliest stages of their work in the Northern District of Alabama.

Additional investigation has revealed, however, that Ms. Pashova and Mr. Velikov were part of an organized group of individuals who traveled from state to state placing skimmers and recording devices, sometimes cameras, on ATM machines belonging to various financial institutions.

With this equipment, Ms. Pashova, Mr. Velikov and their other co-schemers harvested account information and personal identification numbers from debit/credit cards used at those ATM machines.  Group members then would use equipment like that found in rooms 319 and 320 of the Holiday Inn to create counterfeit debit or credit cards encoded with the stolen information.

Once the counterfeit debit and credit cards had been created, members of the group were able to use the cards often in combination with the stolen PIN information to steal money from the accounts associated with the genuine debit or credit cards.

The group of which Ms. Pashova and Mr. Velikov were members targeted ATMs associated with various financial institutions across the southeastern United States over a period of almost three years.

Beginning on or before August [3], 2008, and continuing until a few weeks before their apprehension in Hoover, Alabama, the skimming group

placed skimmers and PIN recording devices on Bank of America ATMs in at least nine other federal districts, the Eastern, Middle and Western Districts of North Carolina, the Middle and Southern Districts of Florida, the Eastern District of Virginia, the Eastern and Middle Districts of Tennessee, and the District of South Carolina.

Bank of America has confirmed the following information regarding those skimming events and the associated amounts of money lost as a result of [the stolen data. Between August 3, 2008 and August 30, 2009], the group that included the defendants affected two ATMs, each of which was in a different city, in the Eastern District of North Carolina.[3]  In that district, the aggregate loss was $30,569.91.

Between September [13, 2008], and September [14, 2008], the group skimmed at one ATM in the Middle District of North Carolina resulting in an aggregate loss of $42,207.12.  From September [21,] 2008, through August [22,] 2010, the group skimmed at six different ATMs that were spread across four cities in the Western District of North Carolina, the aggregate loss in that district was $154,625.28.

Between November 15, 2008, and May 10, 2009, the group skimmed at five different ATMs spread across four cities in the Middle District of Florida.  The aggregate loss in that district was $61,439.27.

Between February [15], 2009, and May [8,] 2010, the group affected and skimmed at five different ATMs spread across five cities in the Southern District of Florida.  The aggregate loss in that district was $149,539.16.

On September [14,] 2009, the group skimmed at one ATM in the Eastern District of Virginia.  The aggregate loss associated with that event was $12,208.96.  Between September [6,] 2010 and March [20], 2011, the group skimmed at seven different ATMs spread across three cities in the Middle District of Tennessee, resulting in a total loss in that district of $231,491.02.

On November [24], 2010, the group skimmed at a single ATM in the Eastern District of Tennessee, resulting in a loss in that district of $18,303. Between February [12,] 2011, and March [13,] 2011, the group skimmed at

---

[3](*See* Crim. Doc. 24 at 7.)

two different ATMs in two cities in the District of South Carolina, resulting in a loss in that district of $162,094.90.

The aggregate loss associated with these skimming events, Your Honor, was totaled to $862,478.62. That amount includes the $74,000 associated with the cards recovered in Birmingham.

. . .

MS. ATWOOD:   In some cities, [Ms.] Pashova and Mr. Velikov conducted multiple skimming events against the same Bank of America ATM machine. On all but three occasions, the skimming device placed on each Bank of America ATM by Ms. Pashova, Mr. Velikov and their co-schemers ultimately resulted in money being taken from the accounts of Bank America customers, and Bank of America eventually absorbed that loss.

. . .

MS. ATWOOD:   The parties stipulate and agree to the following matters as terms of this plea agreement:

Based on the facts above, the government could establish that Ms. Pashova, Mr. Velikov and their co-schemers committed bank fraud against the Bank of America in the Eastern, Middle and Western [D]istricts of North Carolina, the Middle and Southern Districts of Florida, the Eastern District of Virginia, the Eastern and Middle Districts of Tennessee and the District of South Carolina if separate criminal cases were pursued in those nine other districts.

Ms. Pashova and Mr. Velikov have waived venue as to prosecution and sentencing of these offenses in those other nine districts, and they consent to sentencing on these bank fraud offenses in the Northern District of Alabama in this case, CR-2:12-41. The fraud in the other nine districts resulted in an *actual loss* to Bank of America of *at least $862,478.62*. The parties do not have an agreement regarding *intended loss* to Bank of America. That issue would be reserved for sentencing.

All of the facts and circumstances surrounding the fraud by Ms. Pashova and Mr. Velikov . . . and their co-schemers in the other nine districts

can be used as relevant conduct for purposes of this plea agreement, including its restitution provisions.

And based on the offense of conviction and the stipulated offenses that occurred in the other nine districts, Ms. Pashova and Mr. Velikov's offenses involve ***250 or more victims*** as that phrase is used in the Sentencing Guidelines.

THE COURT:  All right. Mr. Velikov and Ms. Pashova, you've heard the Assistant U.S. Attorney outline briefly certain of the facts she would expect the government to prove should this case proceed to trial.  Are those facts substantially correct, Mr. Velikov?

DEFENDANT VELIKOV:  Yes, ma'am.

. . .

THE COURT:  You are each not required to enter your pleas of guilty, and you are free at this time to withdraw . . . your pleas of guilty and re-enter not guilty pleas.

Have either of you heard anything here today that causes you to want to reconsider your decisions to enter a plea of guilty, Mr. Velikov?

DEFENDANT VELIKOV:  No, ma'am.

. . .

THE COURT:  Do you each still desire to enter your respective pleas of guilty, Mr. Velikov?

DEFENDANT VELIKOV:  Yes, ma'am.

. . .

THE COURT:  The court finds your pleas of guilty are freely and voluntarily entered, and the requisite factual basis [for] your plea[s] exist[ ]. The pleas of guilty to Counts Two, Four and Five of the indictment are accepted by the court.  . . .

16

. . .

THE COURT:  I'll say this:  I will reserve more statements for sentencing, but reading this, it's an extraordinarily serious crime, and I don't know what you're facing, but I'm glad it's more than three months.  . . .

. . .

I just want to let you know that – and I don't know what their background is, but even if this is their first offense, even if this is their first time, if they've never been caught.  I find this a really extraordinarily serious crime.

MR. BOUDREAUX:  The Guidelines are extreme.

THE COURT:  Well, they should be.  I'm not saying I won't vary, but I'm sure they're extraordinarily high with 862 – what are they, approximately?

MR. BOUDREAUX:  90 months, plus two years.

THE COURT:  I don't know what I will do, but that doesn't shock me for this crime by any means.  I'm not saying what I will do.  I will have to see the whole presentence, but it doesn't surprise me that they're that high.  . . .

(Crim. Doc. 46 at 6-12, 14-15, 20, 29-36, 38, 40-44 [emphasis and footnote added].)

Following the colloquy, the Probation Office prepared a Presentence Investigation Report [PSR], to which Velikov objected.  (Crim. Docs. 29, 36.)  He argued that the Probation Office had erroneously calculated the loss amount as exceeding $1,000,000, and it had erroneously determined that there were 250 or more victims.  (Crim. Doc. 29 at 1, 3.) The Government filed a Sentencing Memorandum, addressing Velikov's objections to the PSR, and, thereafter, the Probation Office filed an Addendum to the PSR, which was responsive to Velikov's objections.  (*See generally* Crim. Doc. 34, doc. 36-1.)

17

The court held sentencing hearings for Velikov and Pashova on October 22, 2012. (*See* Crim. Docs. 47, 50.)  Pashova's hearing immediately preceded Velikov's sentencing hearing and Velikov's counsel was present throughout Pashova's sentencing hearing. (Crim. Doc. 50 at 3, 5.)  The court noted on the record that Velikov's attorney had adopted the arguments and objections made during Pashova's sentencing hearing.  (*Id*. at 5.)  With regard to the sentencing enhancements based on the loss amount and the number of victims, the court held as follows:

> [THE COURT:]  The actual loss to Bank of America is $862,478.62. The parties stipulated in the factual basis of the plea agreement that another credit union suffered a loss of approximately $50,000.  As pointed out again in the probation office's response[,] in Sentencing Guideline Section 2B1.1, Comment Note 3(F)(i) sets a minimum loss amount of $500 per card or counterfeit credit cards and access devices.

> In the search of the two defendants' hotel rooms, the authorities recovered approximately 340 counterfeit access device cards, 129 of which had suffered actual losses.  Applying the $500 minimum loss to the remaining 211 remaining cards, which have not suffered an actual loss, results in an additional $105,500 under Sentencing Guideline 2B1.1.  Therefore, the total of the actual losses, plus the loss under the $500 rule, exceeds a million dollars.[4]

> . . .

> Any additional argument with regard to the intended loss objection that you made in your objections?

---

[4]The amount of the actual loss to Bank of America, $862,478.62, plus the amount of the credit union's loss, $50,000, plus $500 each for the 211 cards, $105,5000, equals $1,017,978.62.

18

MR. BOUDREAUX:  Judge, as you noted, I was present for almost the whole entirety of the last hearing and, obviously, don't expect you to go back through the same repetitive arguments.  If you just would maybe note in the record –

. . .

[THE COURT:]  With regard to the second objection for enhancement for victims, again, you were here for the argument with regard to that.  As I stated in the last hearing, after hearing argument from both counsel – and, again, unless you want to make additional argument, I will accept that you've adopted those arguments made in the last hearing.

Let me make my findings again, which I accept the probation officer's response to your objections and agree – not accept, I agree with it.  They note that Sentencing Guidelines 2B1.1, Comment Note 4(E) states "For purposes of Subsection B(2) in a case involving means of identification that victim means any victim as defined in Application Note 1 or any individual whose means of identification was used unlawfully or without authority."

When the agent searched the defendant's hotel rooms, they found approximately 340 counterfeit cards.  Each of those cards represented an individual whose means of identification was used unlawfully or without authority, i.e., their unique electronic identification number, address or routing code was used unlawfully or without authority to produce a counterfeit access device.[ ]  Therefore, the number of victims is appropriately calculated in the presentence report.

I'm not going to go on whether or not they were victims, the other argument that you make.  That objection is also overruled.

Any other argument you want to make?

MR. BOUDREAUX:  Not with respect to those two points.

THE COURT:  All right.  Any other objections?

MR. BOUDREAUX:  No other objections.

19

THE COURT:  In compliance with Justice Breyer's majority opinion in U.S. versus Booker, this court, while not bound to apply the Guidelines, has consulted them and taken them into account on the issue of the appropriate range of sentence to be imposed.

In that regard, the court notes that, in his plea agreement, the defendant waived any right he may have for a jury determination of the facts in accordance with the Supreme Court's decision in U.S. versus Booker, and the defendant admitted certain facts that bear upon the computation of his offense level under the Guidelines.

The court having ruled on the objections and overruled the objections that affect the Guidelines, the court adopts the factual statements contained in the presentence report and makes specific findings that the Guidelines Offense Level is 30.  The Criminal History Category is I.  The Advisory Guideline Imprisonment Range applicable to Counts Two and Four is from 97 months to 121 months.  The Guideline term of imprisonment for Count Five is two years to be imposed consecutively to any other term of imprisonment imposed on the defendant, including the terms of custody imposed in Counts Two and Four.  The fine range is from $15,000 to $1 million.  The Guideline term of supervised release is two years to five years.  However, the court notes that pursuant to Section 5D1.1(c), the court ordinarily should not impose a term of supervised release in a case of which supervised release is not required by statute and the defendant is a deportable alien who likely will be deported after imprisonment.  Restitution is an issue in this case.

(Crim. Doc. 50 at 4-8 [footnote added].)

Thereafter, the court imposed a custodial sentence of 97 months on Counts Two and Four separately, with each count to be served concurrently with the other, and 24 months on Count Five, with the sentence to be served consecutively to the term of custody imposed in Counts Two and Four.  (*Id*. at 15-16.)  After expressly considering the factors set forth in 18 U.S.C. § 3553(a), the court found, "[T]he sentence imposed is a reasonable one in light of the Guidelines and the factors found at 18 [U.S.C. §] 3553(a).  The court concludes that the

20

sentence imposed would have been the same regardless of how the Guideline issues raised by the defendant had been resolved." (*Id*. at 16-18.)  In addition to the custodial sentence, the court "ordered [Velikov] to pay restitution of $862,478.62 with interest waived to the Bank of America," with payments of $25 per quarter to be paid during his custodial sentence and the balance to be paid in full "no later than the end of the defendant's term of supervision," which is five years. (*Id*. at 18-19, 20-21.)  The court noted, [E]ven though I'm going to order supervision, you probably will be deported and likely you will probably never have to pay any of the restitution on this enormous fraud . . . ." (*Id*. at 20.)

At the close of the hearing, the court stated:

> THE COURT:  Although the plea agreement contained a waiver right to appeal, and that waiver is likely valid, I always tell a defendant you have the right to appeal the sentence imposed within 14 days if you believe that the sentence is in violation of the law; but, again, such waivers of right to appeal are generally enforceable.

(*Id*. at 23-24.)  Velikov did not file a direct appeal.

On October 18, 2013, Velikov filed this Motion to Vacate.  (Doc. 1; Crim. Doc. 49.) The Motion to Vacate does not allege any grounds for relief, (doc. 1 at 4-10); however, in his accompanying Memorandum of Law, Velikov alleges ineffective assistance of counsel on the following grounds:

> 1.  Counsel was ineffective for agreeing to the appeal/habeas waiver provision in the plea agreement.

> 2.  Counsel was ineffective by "mis-representing . . . that the petitioner was competent to read, speak, or understand the English language."

3.  Counsel was ineffective for "[f]ailing to object at sentencing to the total amount of 'Loss' to the victims, as it was impossible to be $862,478.62."

4.  Counsel was ineffective for "[f]ailing . . . to object to the number of victims alleged."

5.  Counsel was ineffective "[a]t sentencing for failing to object to the Court's finding of the intended loss and potential loss were identical (i.e., over one million)."

6.  Counsel was ineffective "[a]t sentencing for failing to object to the court's only applying one means of determining petitioner's amount of restitution."

7.  Counsel was ineffective "[a]t sentencing for failing to object to the amount of restitution without the court's consideration of the petitioner's ability to pay the restitution."

8.  Counsel was ineffective "[a]t sentencing for failing to object to the court's imposition of restitution in addition to the one hundred twenty-one (121) months of imprisonment."

9.  Counsel was ineffective "[a]t sentencing for failing to object to the court's imposition of two punishments for the same conduct – double jeopardy."

(*See* doc. 2 at 2-3.)

## II.  DISCUSSION

### A.  SECTION 2255 STANDARD

This court has held that the habeas petitioner "has the burden of showing he is entitled to relief from his sentence pursuant to 28 U.S.C. § 2255.  Relief under 28 U.S.C. § 2255 is reserved for transgressions of constitutional rights and for that narrow compass of other injury that could not have been raised on direct appeal and would, if condoned, result in a

complete miscarriage of justice." *Bryant v. United States*, No. 5:07-CR-0205-SLB-PWG, 2014 WL 519619, at *7 (N.D. Ala. Feb. 10, 2014)(quoting *Richards v. United States,* 837 F.2d 965, 966 (11th Cir. 1988) and citing *LeCroy v. United States*, 739 F.3d 1297, 1321 (11th Cir. 2014) and *Greene v. United States,* 880 F.2d 1299, 1301 (11th Cir. 1989))(internal quotations and citations omitted).  Relief under § 2255 is limited to relief from a custodial sentence and may not be used to challenge an order of restitution.  *See United States v. Harris*, 546 Fed. Appx 898, 901 (11th Cir. 2013)(citing *Mamone v. United States*, 559 F.3d 1209, 1211 (11th Cir. 2009)).

When a habeas petitioner has been convicted based on a plea of guilty and he makes "statements under oath at a plea colloquy, 'he bears a heavy burden to show his statements were false.'"  *Winthrop-Redin v. United States*, 767 F.3d 1210, 1217 (11th Cir. 2014)(quoting *United States v. Rogers*, 848 F.2d 166, 168 (11th Cir. 1988)(per curiam)).  His "solemn declarations in open court carry a strong presumption of verity."  *Id.* (quoting *Blackledge v. Allison*, 431 U.S. 63, 74 (1977)).  Also his guilty plea waives all but certain, well-defined claims:

> After a criminal defendant has pleaded guilty, he may not raise claims relating to the alleged deprivation of constitutional rights occurring prior to the entry of the guilty plea, but may only raise [1] jurisdictional issues, *United States v. Patti,* 337 F.3d 1317, 1320 (11th Cir. 2003), *cert. denied,* 540 U.S. 1149, 124 S. Ct. 1146, 157 L.Ed.2d 1042 (2004), [2] attack the voluntary and knowing character of the guilty plea, *Tollett v. Henderson,* 411 U.S. 258, 267, 93 S. Ct. 1602, 36 L. Ed. 2d 235 (1973); *Wilson v. United States,* 962 F.2d 996, 997 (11th Cir.1992), or [3] challenge the constitutional effectiveness of the assistance he received from his attorney in deciding to plead guilty, *United States v. Fairchild,* 803 F.2d 1121, 1123 (11th Cir.1986).  In other words, a

voluntary and intelligent plea of guilty made by an accused person who has been advised by competent counsel may not be collaterally attacked. *Mary v. Johnson,* 467 U.S. 504, 508 (1984). A guilty plea must therefore stand unless induced by misrepresentation made to the accused person by the court, prosecutor, or his own counsel. *Mary,* 467 U.S. at 509, *quoting, Brady v. United States,* 397 U.S. 742, 748 (1970). If a guilty plea is induced through threats, misrepresentations, or improper promises, the defendant cannot be said to have been fully apprised of the consequences of the guilty plea and may then challenge the guilty plea under the Due Process Clause. *Mary,* 467 U.S. at 509. *See also Santo Bello v. New York,* 404 U.S. 257, 92 S. CT. 495, 30 L. Ed. 2d 427 (1971).

*Caceres v. United States*, No. 13-22901-CIV, 2014 WL 5761112, at *8 (S.D. Fla. Nov. 5, 2014). "The subsequent presentation of conclusory allegations unsupported by specifics is subject to summary dismissal, as are contentions that in the face of the record are wholly incredible." *Blackledge*, 431 U.S. at 74.

Velikov's grounds for relief are based on allegations of ineffective assistance of counsel. "[T]he two-part *Strickland v. Washington* test applies to challenges to guilty pleas based on ineffective assistance of counsel." *Hill v. Lockhart*, 474 U.S. 52, 58 (1985). Pursuant to *Strickland*, "An ineffective assistance claim has two components: A petitioner must show that counsel's performance was deficient, and [he must show] that the deficiency prejudiced the defense." *Wiggins v. Smith*, 539 U.S. 510, 521 (2003)(citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)).

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

24

Unless a defendant makes both showings, it cannot be said that the conviction
or . . . sentence resulted from a breakdown in the adversary process that
renders the result unreliable.

*Strickland*, 466 U.S. at 687.

"A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment.  The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance."  *Id*. at 690.  "An attorney's responsibility is to investigate and to evaluate his client's options in the course of the subject legal proceedings and then to advise the client as to the merits of each."  *Stano,* 921 F.2d at 1151.  However –

. . . [C]ounsel owes a lesser duty to a client who pleads guilty than to one who decides to go to trial, and in the former case counsel need only provide his client with an understanding of the law in relation to the facts, so that the accused may make an informed and conscious choice between accepting the prosecution's offer and going to trial.  To impart such an understanding to the accused, counsel must, after making an independent examination of the facts, circumstances, pleadings and laws involved, offer his informed opinion as to the best course to be followed in protecting the interests of his client.  The interest underlying [a defendant's] claim is his interest in having, before he judges the desirability of the plea bargain, a general knowledge of the possible legal consequences of facing trial.

*Wofford v. Wainwright,* 748 F.2d 1505, 1508 (11th Cir. 1984)(internal citations omitted).

In the context of a collateral challenge to a guilty plea, "The second, or 'prejudice,' requirement [of *Strickland*] focuses on whether counsel's constitutionally ineffective performance affected the outcome of the plea process.  In other words, "Where a claim of

25

ineffective assistance involves a plea agreement, to show prejudice, the defendant must show a reasonable possibility that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial.  In so doing, a defendant must demonstrate that a decision to reject the plea bargain would have been rational under the circumstances." *Gutierrez v. United States*, 560 Fed. Appx 924, 927 (11th Cir. 2014)(quoting *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010) and *Hill v. Lockhart,* 474 U.S. 52, 59 (1985)).

## B.  APPEAL WAIVER

Velikov alleges that the appeal/post-conviction relief waiver in his plea agreement is not valid based on his lack of understanding.  The court pretermits any discussion of whether the appeal waiver is valid because each ground for relief raised by Velikov is based on ineffective assistance of counsel, (*see* doc. 2 at 2-3), and such grounds are outside the terms of the waiver, (*see* Crim. Doc. 24 at 13-14).

## C.  VELIKOV'S ABILITY TO UNDERSTAND ENGLISH

Velikov contends that his counsel was ineffective because he "[c]ontinuous[ly] misrepresent[ed] . . . that [Velikov] was competent to read, speak, or understand the English language."  (Doc. 2 at 2.)  He also contends, "The court failed to measure my comparative ability to speak English."  (Doc. 9 at 2.)

> "A criminal defendant who relies principally upon a language other than English has a statutory right to a court-appointed interpreter when his comprehension of the proceedings or ability to communicate with counsel is impaired." *United States v. Lim,* 794 F.2d 469, 470 (9th Cir. 1986)(citing 28 U.S.C. § 1827(d)(1)).  "'[A] defendant is only statutorily entitled to the appointment of an interpreter if the district court determines that the defendant

[or a witness]:  (1) speaks only or primarily a language other than the English language; *and* (2) this fact inhibits [his] comprehension of the proceedings or communication with counsel' or the presiding judicial officer." *United States v. Edouard,* 485 F.3d 1324, 1337 (11th Cir. 2007)(quoting *United States v. Johnson,* 248 F.3d 655, 661 (7th Cir.2001)).  "'Any indication to the presiding judicial officer that a criminal defendant speaks only or primarily a language other than the English language should trigger the application of Sections (d) and (f)(1) [defendant's waiver of the right to an interpreter] of the Court Interpreters Act .'" *Id.* (quoting *United States v. Tapia,* 631 F.2d 1207, 1209 (5th Cir. 1980)).  Thus, "***the trial court [has] a mandatory duty to inquire as to the need for an interpreter when a defendant has difficulty with English.***" *Id.* (quoting *Valladares v. United States,* 871 F.2d 1564, 1565-66 (11th Cir. 1989)).  "Trial courts may be put on notice of the defendant's 'difficulty with English' where the defendant is 'arraigned through an interpreter,'. . . where the defendant 'testifies in his own behalf through the use of an interpreter,' . . . where there are several places in the trial transcript where the court reporter noted that the defendant's testimony was unintelligible, . . . or when it is otherwise 'clear that the defendant's communication with the court or counsel is inhibited by language[.]'"  *Id.* at 1338 (quotations omitted).  "As a constitutional matter, in determining whether an interpreter is needed, the trial court must balance the defendant's rights to due process, confrontation of witnesses, effective assistance of counsel, and to be present at his trial 'against the public's interest in the economical administration of criminal law.'" *Id.* (quoting *Valladares,* 871 F.2d at 1566).  Whether an interpreter is required, pursuant to the Court Interpreters Act and as a constitutional matter, "is committed to the sound discretion of the trial judge . . . ." *Id.* at 1337.

*Khanani v. United States*, No. 6:02-CR-171-ORL28KRS, 2009 WL 3055307, at *5 (M.D. Fla. Sept. 24, 2009)(emphasis added).

Despite an adequate opportunity to do so, Velikov waited until this post-judgment proceeding to raise for the first time that he did not understand the criminal proceedings because of a language barrier.  The time to raise a language barrier would be at such time as the court could protect a defendant's rights.  "The accused must do his part to allow the constitutional and other protections to function effectively." *Dewitt v. McDonough*, No.

8:03-CV-856-T-30MAP, 2006 WL 2850101, at *24 (M.D. Fla. Oct. 3, 2006)(citing *Valladares v. United States,* 871 F.2d 1564, 1566 (11th Cir. 1989)).

Nevertheless, the court finds Velikov's recent assertion of a language barrier is not credible as this statement is rebutted by his statement to the Magistrate Judge that he did not need the assistance of an interpreter,[5] as well as his interaction with this court and counsel and the court's observance of Velikov throughout the proceedings.  Also, counsel has testified that he had no difficulty communicating with Velikov and that Velikov understood the proceedings.  The court finds that Velikov did not demonstrate he had difficulty with English such that the court had a duty to inquire further into whether Velikov required an interpreter.  Because the court finds Velikov's assertion of a language barrier is not credible, the court finds that counsel's performance in asserting that Velikov could understand English was not deficient.

Therefore, the Motion to Vacate will be denied as to this Ground.

## D.  CALCULATION OF SENTENCING GUIDELINE RANGE

### 1.  Loss Amount

#### a.  Bank of America

---

[5]The court notes that Velikov repeatedly asserts that his counsel waived the interpreter during his arraignment.  However, the transcript of that proceeding demonstrates that Velikov, not his counsel, indicated he could proceed without an interpreter.  (Crim. Doc. 51 at 2.)

Velikov contends that counsel was ineffective for failing to object to the actual amount of Bank of America's loss.  He contends that the Bank of America's loss of $862,478.62 "is a factual, legal and financial impossibility" because ATMs only dispense cash in $20 bills.[6]  (Doc. 9 at 4; *see also* doc. 2 at 13-14.)  Whether or not this is a meritorious objection, Velikov has waived any challenge to the amount of Bank of America's loss because he stipulated that the "actual loss to Bank of America" was "at least $862,478.62" in his Plea Agreement and during the plea colloquy.  (Crim. Doc. 24 at 9 ["The fraud in the other nine districts resulted in an actual loss to Bank of America of at least $862,478.62."]; *see also* Crim. Doc. 46 at 41-42.)

"When a defendant pleads guilty, the [Government] is free to seek judicial sentence enhancements so long as the defendant . . . stipulates to the relevant facts . . . ."  *Blakely v. Washington*, 542 U.S. 296, 310 (2004).  Because Velikov stipulated to the amount of Bank of America's actual loss, the court finds counsel's failure to object to this amount at sentencing was not deficient performance.

The Motion to Vacate will be denied on this ground.

---

[6]The court notes that the record does not limit Bank of America's loss to amounts withdrawn from ATMs.  Rather, the record shows that banking customers' personal identifications were skimmed from ATMs, but the uses of such identifications were not limited to cash withdrawals from an ATM.

**b.  Intended Loss – $500 per Card**

Velikov argues that his counsel was ineffective because he failed to object to the court's determination of the amount of loss for sentencing purposes by calculating $500 per fraudulent card found in Velikov and Pashova's hotel rooms after their arrests, without regard to the individual victims' credit limit.  (Doc. 9 at 5.)  The court finds Velikov cannot establish prejudice arising from counsel's failure to object as the loss amount was properly calculated.[7]

The Application Note 3(F)(i) provides, "In a case involving any counterfeit access device or unauthorized access device, loss includes [1] any unauthorized charges made with the counterfeit access device or unauthorized access device ***and*** [2] shall be not less than $500 per access device."  Sentencing Guidelines § 2B1.1, Application Notes 3(F)(i) (Nov. 1, 2011).  The court applied the Guideline's Advisory Note to establish the loss amount for sentencing purposes:

> The actual loss to Bank of America is $862,478.62.  The parties stipulated in the factual basis of the plea agreement that another credit union suffered a loss of approximately $50,000.  As pointed out again in the probation office's response[,] in Sentencing Guideline Section 2B1.1, Comment Note 3(F)(i) sets a minimum loss amount of $500 per card or counterfeit credit cards and access devices.

> In the search of the two defendants' hotel rooms, the authorities recovered approximately 340 counterfeit access device cards, 129 of which had suffered actual losses.  Applying the $500 minimum loss to the remaining 211 remaining cards, which have not suffered an actual loss, results in an

---

[7]Counsel did object to the calculation of loss for purposes of sentencing.

> additional $105,500 under Sentencing Guideline 2B1.1.  Therefore, the total
> of the actual losses, plus the loss under the $500 rule, exceeds a million
> dollars.

(Crim. Doc. 50 at 4.)  This method of calculating the loss amount for purposes of sentencing

is proper.  *See United States v. Torres-Bonilla*, 556 Fed. Appx 875, 882 (11th Cir.

2014)(using actual loss amount for access devices for which loss could be determined and

adding "the minimum loss amount of $500 per card" for each access device for which no

actual loss information is available).

Based on the foregoing, the court finds Velikov cannot establish that he was

prejudiced by any alleged error in counsel's failure to object to the calculation of intended

loss.[8]

The Motion to Vacate on this ground will be denied.

### 2.  Number of Victims

Velikov alleges that counsel was ineffective by failing to object to the number of

victims used for sentencing purposes.  (Doc. 2 at 2.)  He argues:

> A total of three hundred forth (340) cards seized of which two hundred
> ninety-four (294) were Bank of America.  The government's own Exhibit "A"
> shows only one hundred thirty (130) "victims" ($74,316.50) of which
> eighty-eight (88) are shown which are financially impossible to achieve the
> stated "loss" via an ATM ($57,226.50).  This leaves forty-two (42) possible
> victims, less five (5) from Exhibit "D" showing a "0.00" balance at the time of

---

[8]Velikov also objects to counsel's "fail[ure] to object to the Court's finding of the
intended loss and potential loss were identical."  (Doc. 2 at 3.)  The record contains no such
finding by the court.  Therefore, Velikov's counsel was not ineffective for failing to object
to a finding that was not made.

the fraud, leaving (37 victims + Bank of America + one credit union ) thirty-nine (39) victims for a total loss of $17,090.00.

(*Id*. at 17.)  The court rejects Velikov's calculation of the number of victims.

Moreover, the court finds that Velikov cannot establish any prejudice arising from counsel's failure to object to the number of victims because Velikov stipulated that his "offenses 'involved 250 or more victims,' as that phrase is used in U.S.S.G. § 2B1. 1 (b)(2)." (Crim. Doc. 24 at 10.)  This stipulation is binding on Velikov.  "When a defendant pleads guilty, the [Government] is free to seek judicial sentence enhancements so long as the defendant . . . stipulates to the relevant facts . . . ." *Blakely v. Washington*, 542 U.S. 296, 310 (2004)

Assuming Velikov is not bound by this stipulation in the Plea Agreement, the court finds that Velikov has not alleged facts to support his assertion that counsel did not object to the number of victims for purposes of sentencing.  Prior to sentencing, his counsel objected to the enhancement based on the number of victims, arguing:

> The government has shown only two victims in this case – Bank of America and the credit union . . . .  [T]he Application Notes make it clear that Mr. Velikov can only be liable for the actual losses suffered.  Moreover, Application Note 3(E) states that the calculation of loss must be reduced by "the money returned".  The government has not provided any evidence that these alleged victims even knew that their funds were missing.
>
> Further, these account holders were reimbursed by Bank of America and the credit union, which are why there two institutions have claimed the full amount of the loss and are entitled to the restitution.  Based on the plain reading of the Application Notes, account holders do not suffer any "loss" when the accounts are reimbursed.  The only victims in this case were the banks that sustained the actual loss.  Therefore . . . no additional enhancements

should apply because the government has proven less than 10 victims, thereby excluding Mr. Velikov from the Specific Offense Characteristic of +6 contained in U.S.S.G. Section 2B1.1(2).

(Crim. Doc. 29 at 3-4.)  The court overruled Velikov's objections, stating:

> . . . Sentencing Guidelines 2B1.1, Comment Note 4(E) states that "For purposes of Subsection B(2) in a case involving means of identification that victim means any victim as defined in Application Note 1 or any individual whose means of identification was used unlawfully or without authority."
>
> When the agent searched the defendant's hotel rooms, they found approximately 340 counterfeit cards.  Each of those cards represented an individual whose means of identification was used unlawfully or without authority, i.e., their unique electronic identification number, address or routing code was used unlawfully or without authority to produce a counterfeit access device.[9]  Therefore, the number of victims is appropriately calculated in the presentence report.

(Crim. Doc. 50 at 6-7 [footnote added].)

The court finds that, contrary to Velikov's assertion, his counsel actually objected to the number of victims for purposes of sentence enhancement.  Therefore, the court finds that Velikov has not show counsel's performance was deficient.

The Motion to Vacate on this ground will be denied.

## E.  RESTITUTION ORDER

Velikov argues that his counsel was ineffective for failing to object to the restitution order.  (Doc. 2 at 2.)  However, "28 U.S.C. § 2255 does not offer relief from the

---

[9]During the sentencing hearing for Pashova, the court stated:  "[I]n my view, they [individuals' means of identification] were used.  They were used by virtue of the fact that they used these identifications to encode the cards.  They weren't actually maybe all used to get money, but they were used."  (Crim. Doc. 47 at 10.)

non-custodial features of a criminal sentence." *United States v. Harris*, 546 Fed. Appx 898, 901 (11th Cir. 2013)(citing *Mamone v. United States*, 559 F.3d 1209, 1211 (11th Cir. 2009)). "That [Velikov] couched his arguments in terms of a claim for ineffective assistance of counsel does not affect the preclusion of this claim from a § 2255 proceeding because even if his counsel was ineffective in this regard, he would not be entitled to relief under § 2255." *See Heard v. United States*, No. 8:12-CR-52-T-30EAJ, 2014 WL 4674314, at *7 (M.D. Fla. Sept. 18, 2014).

Therefore, Velikov's Motion to Vacate will be denied as to all grounds seeking relief from the restitution aspect of his criminal sentence.

## **CONCLUSION**

Based on the foregoing, the Motion to Vacate filed by petitioner Antonio Velikov, (Doc. 1; Crim. Doc. 49), is due to be denied.  An Order denying the Motion to Vacate will be entered contemporaneously with this Memorandum Opinion.

## **CERTIFICATE OF APPEALABILITY**

Rule 11 of the Rules Governing § 2255 Proceedings, provides, "The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."  The applicant for § 2255 relief "cannot take an appeal unless a circuit justice or a circuit or district judge issues a certificate of appealability under 28 U.S.C. § 2253(c)." Fed. R. App. P. 22(b)(1).   And, the "certificate of appealability may issue . . . ***only*** if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C.

34

§ 2253(c)(2)(emphasis added).  To make a substantial showing of the denial of a constitutional right, the applicant must show "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Miller–El v. Cockrell*, 537 U.S. 322, 336 (2003)(citations and internal quotations omitted).

Velikov has not demonstrated that he was denied any constitutional right or that the issues he raises are reasonably debatable and/or deserve encouragement to proceed further. Therefore, issuance of a certificate of appealability is not warranted in this case.

**DONE** this 16th day of February, 2016.


SHARON  LOVELACE  BLACKBURN
SENIOR UNITED STATES DISTRICT JUDGE

35